```
                                            ┌─────────────────────────────┐
                                            │ USDC SDNY                   │
                                            │ DOCUMENT                    │
                                            │ ELECTRONICALLY FILED        │
                                            │ DOC #:_____ │
                                            │ DATE FILED: 9/17/2021       │
                                            └─────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
NANCY BENITEZ,                          :
                                        :
                    Plaintiff,          :          20-CV-5026 (RWL)
                                        :
        - against -                     :          **DECISION AND ORDER:**
                                        :          **<u>SOCIAL SECURITY APPEAL</u>**
COMMISSIONER OF SOCIAL SECURITY,        :
                                        :
                    Defendants.         :
-------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff Nancy Benitez, represented by counsel, commenced the instant action against the Commissioner of the Social Security Administration (the "Commissioner") pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of the Commissioner's decision that Benitez is not entitled to disability insurance benefits ("DIB") or supplemental security income benefits ("SSI") under 42 U.S.C. § 423 et seq.  Benitez moves for judgement on the pleadings pursuant to Rule 12(c) of the Federal Rules Of Civil Procedure, seeking an order to remand this case solely for a calculation and award of damages or, in the alternative, a new hearing and decision.  (Dkts. 21, 26 at 4.)  The Commissioner cross-moves for judgment on the pleadings and asks this Court to affirm the Commissioner's decision.  (Dkt. 24.)  For the reasons explained below, Benitez's motion is GRANTED, the Commissioner's motion is DENIED, and the case is remanded for a new hearing and decision consistent with this opinion.

**OVERVIEW**

Benitez is a 54-year-old woman.  (R. 221 (stating date of birth).[1])  During the relevant period of time, she had two children, one adult son who lived on his own and one son in elementary school who lived with her.  (R. 29.)  Benitez suffered from depression and anxiety, which she alleges prevented her from maintaining gainful employment starting on February 23, 2015 (her "onset date").  (R. 74.)  Her "date last insured" – the date by which she needed to be disabled to qualify for benefits – was determined to be June 30, 2019.  (R. 75.)

An Administrative Law Judge ("ALJ") denied her applications for DIB and SSI on November 29, 2018.  (R. 86.)  With one modification to the ALJ's findings, the Appeals Council of the Social Security Administration (the "Administration" or "SSA") affirmed that decision on April 29, 2020.  (R. 8.)  The record before the ALJ and Appeals Council contained relevant treatment records from March 2015 through August 2018, during which time Benitez treated regularly with two psychiatrists, one from October 2015 through March 2018 and another from May through November 2018.  (R. 522-91, 816-23, 870-921.)  The ALJ and Appeals Council also had medical opinions from, among others, both of Benitez's treating psychiatrists and an SSA consultative examiner, who examined Benitez once in January 2017 and did not review any of her medical records. (R. 320-22, 325-29, 864-69.)

In their opinions, both of Benitez's treating psychiatrists found that the symptoms of Benitez's depression and anxiety would significantly limit her ability to function in a work environment in numerous respects.  (R. 328, 868.)  The Administration's

---

[1] "R." refers to the certified administrative record (Dkt. 18).

consultative examiner, however, found that Benitez's symptoms caused no significant limitations in her ability to work.  (R. 322.)

In finding that Benitez was not disabled, the ALJ and Appeals Council ascribed "little weight" to the opinions of her treating psychiatrists and "some weight" to the opinion of the Administration's consultative examiner.  (R. 82-84 (ALJ decision), 4-6 (Appeals Council adopting the ALJ's findings).)  In discounting the opinions of Benitez's treating physicians, the ALJ and Appeals Council did not explicitly address the factors outlined in *Burgess v. Astrue*, 537 F.3d 117 (2d Cir 2008), which was procedural error.  *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019).  The Court thus conducted a searching review of the record to determine whether the ALJ gave "good reasons" for ascribing little weight to the opinions of Benitez's treating physicians.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  The Court concludes that she did not.  Accordingly, the Court remands for further proceedings consistent with this opinion.

## APPLICABLE LAW

Before providing a more detailed recitation of the factual and procedural history, it is helpful to summarize the standard of review and legal principles that apply to disability claims.

### A.    Standard Of Review

A United States District Court may affirm, modify, or reverse (with or without remand) a final decision of the Commissioner.   42 U.S.C. § 405(g); *Skrodzki v. Commissioner Of Social Security Administration*, 693 F. App'x 29, 29 (2d Cir. 2017) (summary order).  The inquiry is "whether the correct legal standards were applied and whether substantial evidence supports the decision."  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004); *see also Talavera v. Astrue,* 697 F.3d 145, 151 (2d Cir. 2012) (same).

"'Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations.'"  *Douglass v. Astrue*, 496 F. App'x 154, 156 (2d Cir. 2012) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265, 269 (2d Cir. 2008) (remanding for noncompliance with regulation, which resulted in incomplete factual findings)).  Courts review de novo whether the correct legal principles were applied and whether the legal conclusions made by the ALJ were based on those principles.  *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) (reversing where the court could not "ascertain whether [the ALJ] applied the correct legal principles … in assessing [plaintiff's] eligibility for disability benefits"); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (reversing where the Commissioner's decision "was not in conformity with the regulations promulgated under the Social Security Act"); *Thomas v. Astrue*, 674 F. Supp.2d 507, 515, 520 (S.D.N.Y. 2009) (reversing for legal error after de novo consideration).

If the reviewing court is satisfied that the ALJ applied the correct legal standards, then the court must "'conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision.'"  *Brault v. Social Security Administration, Commissioner*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).  Substantial evidence is defined as "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971)); *see also Biestek v. Berryhill*, __ U.S. __, __, 139 S. Ct. 1148, 1154 (2019) (reaffirming same standard).   "The

substantial evidence standard means once an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would ***have to conclude otherwise***."  *Brault*, 683 F.3d at 448 (internal quotation marks omitted) (emphasis in original); *see also* 42 U.S.C. § 405(g) ("findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive").

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record."  42 U.S.C. § 423(d)(5)(B).  The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based."  42 U.S.C. § 405(b)(1).  While the ALJ's decision need not "mention[ ] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "'reconcile explicitly every conflicting shred of medical testimony,'" *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability, *see Ericksson v. Commissioner Of Social Security*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler*, 546 F.3d at 268-69 (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01-CV-1120, 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence).

Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).  The court must afford the Commissioner's determination considerable deference and may not substitute "'its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'"  *Jones v.*

*Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v. Secretary Of Health And Human Services*, 733 F.2d 1037, 1041 (2d Cir. 1984)); *Dunston v. Commissioner Of Social Security,* No. 14-CV-3859, 2015 WL 54169, at *4 (S.D.N.Y. Jan. 5, 2015) (same) (quoting *Jones*, 949 F.2d at 59), *R. & R. adopted*, 2015 WL 1514837 (S.D.N.Y. April 2, 2015).   Accordingly, if a court finds that there is substantial evidence supporting the Commissioner's decision, the court must uphold the decision, even if there is also substantial evidence for the claimant's position.   *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).   The court, however, will not defer to the Commissioner's determination if it is "the product of legal error."   *Dunston*, 2015 WL 54169 at *4 (internal quotation marks omitted) (citing, *inter alia*, *Douglass*, 496 F. App'x at 156; *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)).

**B.     Legal Principles Applicable To Disability Determinations**

Under the Act, every individual meeting certain requirements and considered to have a "disability" is entitled to disability insurance benefits.   42 U.S.C. § 423(a)(1).   The Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A).   A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. § 423(d)(2)(A).

To determine whether an individual is disabled and therefore entitled to disability benefits, the Commissioner conducts a five-step inquiry.  20 C.F.R. § 404.1520.[2]  First, the Commissioner must determine whether the claimant is currently engaged in any substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i).  If so, the claimant is not eligible for benefits and the inquiry ceases.

If the claimant is not engaged in any such activity, the Commissioner proceeds to the second step and must determine whether the claimant has a "severe impairment," which is an impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activities.  20 C.F.R. § 404.1520(a)(4)(ii), (c).  If the claimant does not have an impairment or combination of impairments that are "severe," the claimant is not entitled to benefits and the inquiry ceases.

If the claimant has a severe impairment or combination of impairments, the Commissioner continues to step three and must determine whether the impairment or combinations of impairments is, or medically equals, one of those included in the "Listings" of the regulations contained at 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the claimant's impairment or impairments meet or medically equal one of those listings, the Commissioner will presume the claimant to be disabled, and the claimant will be eligible for benefits.  20 C.F.R. § 404.1520(a)(4)(iii), (d).

If the claimant does not meet the criteria for being presumed disabled, the Commissioner continues to step four and must assess the claimant's residual functional

---

[2] The regulatory citations provided are those for DIB.  Virtually identical provisions applying to SSI appear at 20 C.F.R. § 416 et seq.  For brevity, throughout this decision, the Court cites only to the DIB provisions and incorporates the corresponding SSI provisions by reference.

capacity ("RFC"), which is the claimant's ability to perform physical and mental work activities on a sustained basis despite his or her impairments, and determine whether the claimant possesses the RFC to perform the claimant's past work.   20 C.F.R. § 404.1520(a)(4)(iv).   If so, the claimant is not eligible for benefits and the inquiry ceases.

If the claimant is not capable of performing prior work, the Commissioner must continue to step five and determine whether the claimant is capable of performing other available work.   20 C.F.R. § 404.1520(a)(4)(v), (e).   If the claimant can perform other available work, the claimant is not entitled to benefits.   20 C.F.R. § 404.1520(a)(4)(iv), (v).

The claimant bears the burden of proof for the first four steps.   *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013).   Once the claimant has established that she is unable to perform her past work, however, the Commissioner bears the burden of showing at the fifth step that "there is other gainful work in the national economy which the claimant could perform."   *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (internal quotation marks omitted).

## FACTUAL AND PROCEDURAL HISTORY

### A.   Medical Records

Almost all of Benitez's relevant medical records are from the Outpatient Psychiatry department of the BronxCare Health System ("BronxCare").   (*See* R. 522-91, 816-23, 870-921.)   After being out of treatment for an unspecified amount of time, Benitez began treating regularly at BronxCare starting on March 12, 2015, less than a month after her onset date.   (*See* R. 522.)   At her first few visits, she was seen by Nurse Practitioner ("NP") James Dusenbury.   (*see, e.g.*, R. 523, 525, 527, 532, 535.)   Starting in October 2015, she was seen primarily by Dr. Upendra Bhatt, who was her regular treating psychiatrist and saw her almost every month through March 2018.   (*See* R. 540, 909.)   At

that point, Dr. George Nodarse took over for Dr. Bhatt and became Benitez's regular treating psychiatrist through the remainder of her medical records, which end in August 2018.  (*See* R. 590, 912-15, 918.)  During the course of her treatment, she also regularly saw a psychotherapist – first primarily Jenny Stern, then Neicha Degraff – as well as other doctors, and her treatment team shared information and collaborated on her treatment. (*See, e.g.*, 542, 562-63, 566, 568, 574, 582, 586-88, 590, 817, 819, 823, 872, 878, 890, 895, 906, 917.)

At her first visit, on March 12, 2015, Benitez reported that she had lost her job, her son had gone back to live with his father, she was sleeping poorly, and her prior medication had stopped working and made her sick.  (R. 522.)  NP Dusenbury noted crying, anxiety, stress, a depressed mood, paranoid delusions, preoccupations, and impaired attention and concentration.  (R. 522-23.)  Benitez was prescribed clonazepam (a sedative for anxiety and panic disorders) and paroxetine (a medication for depression and anxiety) and referred for psychotherapy.[3]  (R. 523.)  At her next visit, on March 30, 2015, she noted improvement on her medications with no side effects, which was confirmed by examination.   (R. 524-25.)   On April 23, 2015, she checked into the emergency room with chest pain and her heart beating quickly (R. 695-709) and later testified that medical staff told her that her symptoms were psychosomatic (R. 37).  In May and June 2015, her symptoms remained consistent with her March 30, 2015 BronxCare visit, and in June, she noted not needing her clonazepam in a while.  (R. 527-33.)

---

[3] For consistency, the Court refers to medications by their the generic rather than brand names.

In July 2015, however, Benitez reported feeling anxious and noted that she had run out of her clonazepam.  (R. 533-35.)  In addition to her other medications, Benitez was also given bupropion (an antidepressant).  (R. 534.)  In August, she reported feeling better, that she was "very happy" because she had found a new job, and that she was more relaxed and thus no longer taking her clonazepam, which was discontinued.  (R. 536-38.)

On October 9, 2015, however, Benitez missed an appointment.  (R. 539.)  She was called and agreed to come in the next day but then missed that appointment as well, saying that she did not feel well.  (R. 540.)  On October 17, 2015, she saw Dr. Bhatt for the first time.  (R. 540.)  He noted that Benitez had a history of depression, the symptoms of which were in "partial remission," and that she reported compliance with her medication with no side effects but on-and-off depression and anxiety.  (R. 540.)  Hydroxyzine (an antihistamine also used for anxiety) was added to her bupropion and paroxetine prescriptions.  (R. 541.)  In a note that would recur in nearly every record going forward, Dr. Bhatt noted that a reason for her continued treatment was that "[t]he client's psychiatric symptoms persist and continue to impair the client's functioning in important life areas."  (R. 542.)

In January 2016, Dr. Bhatt noted that Benitez had missed her two prior appointments and that her mood was depressed and anxious.  (R. 543.)  Benitez reported feeling anxious because of living with her mother.   (R. 543.)   Her treatment team discussed the possibility of her moving to a family shelter, and clonazepam was readded to her medication regimen.  (R. 544.)

In February 2016, Benitez missed three more appointments.  (R. 545-46.)  When she was seen again in March 2016, she reported "sporadic" compliance with her medication, that she was still living with her mother, and that she was overwhelmed.  Dr. Bhatt noted that her mood was depressed and anxious.  (R. 548-50.)  In August, Benitez again reported "partial" compliance with her medication but that she was feeling good, had moved out of her mother's apartment, was in a hotel, and would be moving to a family shelter in ten days.  (R. 553-55.)  Hydroxyzine was removed from her treatment plan, so she remained on clonazepam, bupropion, and paroxetine, a regimen she would continue until May 10, 2018.  (R. 554-55, 913-14.)

On September 17, 2016, Dr. Bhatt once again noted that Benitez had missed her last appointment because she was sick but had moved to the family shelter with her son and felt good.  (R. 556.)  Again reporting "partial" compliance with her medication, she denied feeling depressed, sad, hopelessness, helplessness, or lack of interest or pleasure – a note that would recur in the record of every visit going forward.  (R. 556.)  Dr. Bhatt assessed significant improvement in her symptoms of depression and anxiety. (R. 558.)  In a therapy session that month, on September 19, 2016, psychotherapist Stern documented diminished and stabilized symptoms but also noted that Benitez was struggling with housing and related issues in her life.  (R. 562-63.)  Dr. Bhatt confirmed struggles with her housing as well as conflicts with her mother.  (R. 564-66.)

Benitez missed yet another appointment in October 2016 but came in as a walk-in later that month.  (R. 570-71.)  She noted that she was in a family shelter, looking for an apartment but having difficulty.  (R. 571.)  Still reporting partial compliance with her

medication, she stated that she felt good, and Dr. Bhatt assessed her as "psychiatrically stable" and her mood as "good."  (R. 571-72.)

In November 2016, Benitez missed two appointments but arrived for a third.  (R. 574-75.)  She noted that she was taking clonazepam only when she felt "really anxious" and had taken six or seven in the last month and was assessed as psychiatrically stable. (R. 575-76.)  She displayed little change in December 2016.  (R. 870-71.)

At this juncture – between her December 2016 and January 2017 treatment – Benitez was seen by consultative examiner Dr. Broska, who reviewed none of her medical records.  (R. 320.)  Her exam is discussed in detail below.

At her January 2017 treatment, it was noted that Benitez had missed another appointment.  (R. 873.)  While still partially compliant with her medication, Benitez was stressed because of living in a hotel with her son and not having financial support.  (R. 873.)  Dr. Bhatt assessed her mood as anxious and depressed "in mild range."  (R. 875.) Her compliance, symptoms, and assessment remained largely the same in February and April 2017, during which time she missed another appointment.  (R. 876-85.)  In February 2017, Dr. Bhatt rendered his opinion on how Benitez's impairments affected her ability to work, which is discussed in detail below.  (R. 325-29.)

In May 2017, Benitez secured an apartment.  (R. 885.)  Her compliance remained partial, but she noted being less depressed. (R. 885-89.)  Dr. Bhatt assessed her mood as "okay."  (R. 886.)  In June 2017, it was noted that she missed yet another appointment and felt anxious about her bills.  (R. 890.)  Her medication compliance remained partial, but the assessment of her mood returned to "anxious."  (R. 892.)

A record from August 24, 2017, authored by one of her therapists, notes that her anxiety was minimally improved but her depression had not changed, and that she had been "isolating in her house and ignoring outside influences." (R. 894.)  A record from August 26, 2017 authored by Dr. Bhatt, however, noted that her symptoms of anxiety and depression were in remission, and she was responding well to her current medication regimen, which had remained the same since August 2016. (R. 896-98.) With medication compliance still "partial," he listed her mood as "okay." (R. 897.)  The same compliance and assessment were reported in her September 2017 appointment note, when she self-reported feeling "okay." (R. 898-901.)

Benitez's medical record from October 2017 notes "compliance" with medication rather than partial compliance. (R. 901.)  It documented that her symptoms of anxiety and depression were still in remission and that she still felt "okay" but also noted that she "has anxiety attack in subway." (R. 901.)  It is unclear whether that comment referred to a single incident or ongoing condition.

Benitez's next recorded appointment was in February 2018, and she "continue[d] to exhibit symptoms of anxiety [and] tend[ed] to isolate herself." (R. 905.)  The record also documented that she was in a new but unhealthy romantic relationship, observing that her inability to see her self-worth continued to impact her relationship choices. (R. 905.)  She had a second appointment that same month at which it was noted that her father had passed away, but she was "coping with this tragedy appropriately," her symptoms of depression were still in remission, and she was still compliant with her medication regime, which remained the same. (R. 907.)  Those conditions remained the same in March 2018, her last month with Dr. Bhatt. (R. 909-12.)

In April 2018, however, Benitez had had three therapy appointments, the most documented in any one month, and all of them reflect worse conditions than anything in the March 2018 report.  (R. 586-91.)  At the first appointment, Benitez noted that she was feeling overwhelmed and anxious, which she attributed to her son being increasingly defiant, missing school, and refusing to get out of bed.  (R. 586.)  At the second appointment, Benitez discussed fears for her physical health based on a recent breast biopsy and upcoming colonoscopy, which made her "really scared."  (R. 587-88.)  At the third appointment, she was noted to be "very anxious" and expressed distress at the fact that Dr. Bhatt was leaving the clinic.  (R. 590.)  In addition, she was "plugged into" an NP's schedule for an evaluation and medication refill, but "was unable to stay as she became extremely anxious after sitting in the waiting room for a couple of hours."  (R. 590.)

On May 10, 2018, Benitez had her first appointment with Dr. Nodarse.  She reported taking her medication per schedule, believing that it was helpful, and denying feeling sad, low, or anxious but also noted difficulty with her memory at times.  (R. 912-13.)  Dr. Nodarse explained that her memory problems stemmed from the clonazepam, which was discontinued.[4]  (R. 913-14.)  She remained on bupropion and paroxetine, which remained her medication regimen throughout the rest of her records.  (R. 914.)

Benitez's next treatment note, from June 2018, noted that her anxiety was "minimally improved," and that, with her depression, she was making it a point to leave her house daily to drop her son off at school, but that it was "becoming more and more

---

[4] Despite Benitez's reporting of memory problems, her treatment note indicated that her memory was "[w]ithin normal limits."  (R. 913.)

difficult to do so."  (R. 916-17.)  She also expressed awareness that her relationship with her boyfriend was unhealthy, but "seem[ed] more willing to be in a bad relationship than to be alone."  (R. 917.)

In July, she again noted compliance with her medication and denied feeling depressed.  (R. 818.)  Her records continued to express concern with her romantic relationship but again noted minimal improvement with her anxiety and that she was making it a point to leave her house daily to drop off her son, this time without noting that doing so was getting more difficult for her.  (R. 818-23.)

In her final treatment note in the record, from August 14, 2018, Benitez denied feeling sad or having low energy but noted sleeping during the day and then staying awake at night.  (R. 918.)  She stated that she was "trying to do her best to handle her stressors" and reported full compliance with her medication without side effects and also that she felt that psychotherapy was helping.  (R. 918.)  Dr. Nodarse assessed her as "stable at the present time on her current medication," but also noted that she "need[ed] ongoing treatment with medication management and psychotherapy to maintain her clinical stability."  (R. 920.)  Like the vast majority of her records, this one noted that her ongoing treatment was justified because "[t]he client's psychiatric symptoms persist and continue to impair the client's functioning in important life areas."  (R. 920.)

**B.    Social Security Application And Function Report**

Benitez applied for SSI and DIB on November 21, 2016, approximately one year and eight months after she reported losing her job due to her mental impairments and began treating at BronxCare again.  (R. 221, 228, 522 (first BronxCare record).)  As part of her application, Benitez submitted a self-reported "function report," which she completed in December 2016.  (R. 264-271.)

Benitez reported that she cared for her 12-year-old son, buying him food, washing his clothes, and trying to help him with homework; had no problems with her personal care; did not need reminders to take care of her personal needs or medication; could cook hot food for her son and herself; took her son to school and picked him up daily but did not drive because she forgot addresses and got lost a lot; shopped for groceries and clothes in person and online but took a while to shop because she couldn't decide on things most of the time; was able to manage her money; did not spend time with others and the only places she went regularly were the therapist, psychologist, and her son's school; got nervous when around people, could not remember things, and got anxious; forgot words sometimes; was easily distracted; could not follow spoken or written instructions; and stress or changes to her schedule made her anxious and irritated.  (R. 265-271.)

In response to a question asking if she had "ever lost a job because of problems getting along with people," Benitez said "yes," explaining that her boss said that she didn't get along with her coworkers; but, Benitez added that that was "not true."  (R. 271.)  In response to another question, Benitez said that she "sometimes" but not "always" had problems getting along with others.  (R. 269.)

## C.    Opinion Evidence

### 1.    Dr. Broska, Consultative Examining Psychiatrist

On January 4, 2017, the SSA had a consultative psychiatrist, Dr. Arlene Broska, examine Benitez and render an opinion.  (R. 26.)  January 2017 was at about the midpoint of Benitez's treatment with BronxCare, when Benitez was living in a shelter with her son, and her treatment notes indicated that she was anxious and depressed.  (R. 320, 875.)  Dr. Broska noted that Benitez was seeing her psychiatrist, Dr. Bhatt, once per month, and

her therapist Stern, twice per month.  (R. 320.)  Dr. Broska did not, however, review any of Benitez's medical records.  (R. 27.)

Based on that one-time evaluation, Dr. Broska diagnosed Benitez with "[u]nspecified depressive disorder" and concluded that, vocationally, her psychiatric condition placed no limitation on her ability to (1) understand simple directions and instructions; (2) perform simple or complex tasks independently; (3) maintain attention and concentration; (4) learn new tasks; (5) maintain a regular work schedule; (6) make appropriate decisions; or (7) relate adequately with others.  (R. 322.)  Dr. Broska found that Benitez's psychiatric conditions placed a "moderate limitation" only on "dealing with stress."  (R. 322.)

### 2.    Dr. O. Fassler – Non-Examining Consultative Physician

As part of the Administration's initial review of Benitez's claims, Dr. O. Fassler also rendered an opinion.  (R. 58-59, 65-66.)  However, the opinion was rendered on January 9, 2017, before the Administration had obtained any of Benitez's medical records.  (R. 59 (noting that records had been requested but not received), 66 (same), 325 (indicating that first medical record was received on February 21, 2017).)  The opinion is effectively a summary of Dr. Broska's opinion, noting that Dr. Broska's exam was "essentially unremarkable," that Benitez's functioning was "not significantly limited," that she was able to travel independently and care for her child, and concluding that her psychiatric impairment was "non-severe."  (R. 59, 66.)

### 3.    Dr. Bhatt, Treating Psychiatrist

Dr. Bhatt rendered his opinion on February 18, 2017, after he had been treating Benitez for approximately sixteen months.  (R. 325-29, 540 (first appointment with Dr. Bhatt).)  Dr. Bhatt diagnosed Benitez with depression and anxiety based on the following

symptoms: depressed mood; anhedonia (pervasive loss of interest); extreme difficulty concentrating; difficulty being in social interactions; easy distractibility; poor memory; recurrent panic attacks; excessive sleep; and ongoing anxiety.  (R. 326-27.)  He noted that Benitez suffered from episodes of decompensation, when she was unable to work due to increased anxiety and inability to concentrate.  (R. 327.)  Dr. Bhatt found that Benitez's symptoms would interfere with her ability to work in the following ways.

- With respect to the following abilities, her symptoms would have a "marked" limitation, meaning they would "constantly," e.g., "more than 2/3 of an 8-hr. workday," interfere with her ability to: (1) remember locations and work-like procedures; (2) understand and remember detailed instructions; (3) carry out detailed instructions; (4) maintain attention and concentration for extended periods; (5) perform activities within a schedule and consistently be punctual; (6) work in coordination with or near others without being distracted by them; and (7) complete a workday without interruptions from psychological symptoms.

- With respect to the following abilities, her symptoms would have a "moderate-to-marked" limitation, meaning they would "frequently," e.g., "1/3 – 2/3 of an 8-hr. workday," interfere with her ability to: (1) understand and remember one-to-two step instructions; (2) sustain an ordinary routine without supervision; (3) perform at a consistent pace without rest periods of unreasonable length or frequency; and (4) accept instructions and respond appropriately to criticism from supervisors.

- With respect to the following abilities, her symptoms would have a "moderate" limitation, meaning they would "occasionally," e.g., "up to 1/3 of an 8-hr. workday," interfere with her ability to: (1) carry out simple, one-to-two step instructions; (2) make simple work-related decisions; (3) interact appropriately with the public; (4) ask simple questions or request assistance; (5) get along with coworkers or peers without distracting them; (6) maintain socially appropriate behavior; (7) respond appropriately to workplace changes; (8) be aware of hazards and take appropriate precautions; (9) travel to unfamiliar places or use public transportation; (10) set realistic goals; and (11) make plans independently.

- Her symptoms would have none to a "mild" limitation on her ability to adhere to basic standards of neatness.

(R. 328.)  Dr. Bhatt added that Benitez was "unable to maintain work at this time" due to being extremely anxious and that she would miss work "more than three times per month."

(R. 329.)  He found that the above limitations were expected to last at least twelve months, mirroring the SSA definition of a disability.  (R. 325; 42 U.S.C. § 423(d)(1)(A).)  And he noted that Benitez's symptoms and limitations applied as far back as six months.  (R. 329.)

### 4.    Dr. Garfinkle, Consultative Examining Psychiatrist

On advice of counsel, Benitez also obtained a psychiatric examination and consultative opinion from Dr. Eric Garfinkle.  (514-21.[5])  The examination took place on August 30, 2017, shortly after Benitez's treatment notes indicate that her depression and anxiety were in remission but that she had been "isolating in her house and ignoring outside influences."  (R. 514, 894.)  Dr. Garfinkle's opinion was based on his examination of Benitez, Benitez's self-reporting, and a review of Benitez's medical records.  (R. 514, 519.)  Dr. Garfinkle noted that, at the examination, Benitez appeared sad and tearful, shook her leg nervously, and often wiped her nose with a tissue.  (R. 514.)  He diagnosed her with recurrent major depressive disorder and panic disorder based on numerous symptoms, including depressed mood; anxiety; difficulty thinking or concentrating; easy distractibility; and excessive sleep.  (R. 516-518.)  Like Dr. Bhatt, Dr. Garfinkle noted

---

[5] These pages comprise two separate exhibits in the administrative record.  R. 514-16 is the psychiatric evaluation, and R. 517-21 is the opinion.  Both are signed by Dr. Garfinkle, of Ellis Psychology PLLC.  (R. 516, 521.)  The examination is also signed by Dr. James K. Ellis, and at the administrative hearing Benitez's counsel suggested that Dr. Ellis gave the consultative opinion.  (R. 516 (signature page), 27-28 (transcript).)  The record as a whole, however, suggests that Dr. Garfinkle conducted the examination and rendered the opinion, and that is how the ALJ and Appeals Council interpreted it.  (R. 517 (opinion, which only Dr. Garfinkle signed, states that opinion is based on examination), 82-83 (ALJ discussing exam and opinion by Dr. Garfinkle), R. 5 (Appeals Council attributing both exam and opinion to Dr. Garfinkle).)  For purposes of this opinion, it is not material whether Benitez was examined by one or two doctors at Ellis Psychology.

episodes of decompensation with increased panic symptoms and anxiety in work situations.  (R. 519.)

Using the same definitions of marked, moderate-to-marked, and moderate explained above, Dr. Garfinkle found that Benitez's symptoms limited her to work in the following ways:

- They would have a marked limitation on her ability to carry out detailed instructions.

- They would have a moderate-to-marked limitation on her ability to (1) understand and remember detailed instructions; (2) maintain attention and concentration for extended periods; (3) perform activities within a schedule and consistently be punctual; (4) sustain an ordinary routine without supervision; (5) respond appropriately to workplace changes; (6) travel to unfamiliar places or use public transportation; and (7) make plans independently.

- They would have a moderate limitation on her ability to (1) remember locations and work-like procedures; (2) understand and remember one-to-two step instructions; (3) carry out simple, one-to-two step instructions; (4) work in coordination with or near others without being distracted by them; (5) make simple work-related decisions; (6) complete a workday without interruptions from psychological symptoms; (7) perform at a consistent pace without rest periods or unreasonable length or frequency; (8) accept instructions and respond appropriately to criticism from supervisors; and (9) set realistic goals.

- They would have none to a mild limitation on her ability to (1) interact appropriately with the public; (2) ask simple questions or request assistance; (3) get along with coworkers or peers without distracting them; (4) maintain socially appropriate behavior; (5) adhere to basic standards of neatness; and (6) be aware of hazards and take appropriate precautions.

(R. 520.)  Dr. Garfinkle found that Benitez's symptoms would likely cause her to be absent from work "more than three times per month" and expected her limitations to last at least twelve months.  (R. 517, 521.)

**5.     Dr. Nodarse, Treating Psychiatrist**

Dr. Nodarse rendered his opinion on September 4, 2018 after treating Benitez three times (in May, June, and August 2018), when treatment notes indicated that Benitez had been fully compliant with her medication and stable for the last couple months, but treatment was still needed because "[t]he client's psychiatric symptoms persist and continue to impair the client's functioning in important life areas."  (R.  818, 920.)  Dr. Nodarse noted that his opinion was based on an exam, chart review, and discussions with Benitez's psychotherapist.  (R. 867.)

Dr. Nodarse diagnosed Benitez with depressive disorder and anxiety disorder based on several symptoms, including depressed mood; anxiety; blunt and constricted affect; decreased energy; difficulty thinking or concentrating; social withdraw or isolation; and persistent irrational fears due to anxiety.  (R. 866.)  He noted that anxiety was the most frequent symptom, and that Benitez had "difficulty at times sitting in the clinic waiting room" and was "unable to tolerate crowded places."  (R. 865, 867.)

Using the same degrees of limitation defined above, Dr. Nodarse found that Benitez's symptoms would affect her ability to work in the following ways:

- They would have a marked limitation on her ability to (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) sustain an ordinary routine without supervision; (4) work in coordination with or near others without being distracted by them; (5) make simple work-related decisions; (6) ask simple questions or request assistance; (7) accept instructions and respond appropriately to criticism from supervisors; (8) get along with coworkers or peers without distracting them (9) respond appropriately to workplace changes; (10) be aware of hazards and take appropriate precautions; (11) travel to unfamiliar places or use public transportation; (12) set realistic goals; and (13) make plans independently.

- They would have a moderate-to-marked limitation on her ability to (1) remember locations and work-like procedures; (2) understand and remember one-to-two step instructions; (3) understand and remember

detailed instructions; (4) perform activities within a schedule and consistently be punctual; (5) interact appropriately with the public; (6) maintain socially appropriate behavior; and (7) adhere to basic standards of neatness.

- They would have a mild limitation on her ability to carry out simple, one-to-two step instructions.

- Dr. Nodarse did not find that Benitez's symptoms would cause none to mild limitation in any of the listed work functions but stated as "unknown" whether her symptoms would limit her ability to complete a workday without interruptions from psychological symptoms or perform at a consistent pace without rest periods of unreasonable length or frequency.

(R. 868.)  Dr. Nodarse found that Benitez's symptoms would likely cause her to be absent from work "more than three times per month."  (R. 869.)  Based on review of charts and speaking with Benitez's therapist, Dr. Nodarse believed that Benitez's limitations related as far back as 2014, and he expected them to last at least twelve months.  (R. 865, 869.)

In addition, Drs. Bhatt, Garfinkle, and Nodarse all specifically found that Benitez was not a malingerer.  (R. 325, 517, 865.)

**D.    Initial Determination And Appeal**

The Administration rendered its initial decision on Benitez's application for SSI and DIB benefits on January 11, 2017, before receiving any of Benitez's medical records, and before her treating physicians or Dr. Garfinkle had rendered their opinions.   The Administration ascribed "great weight' to the opinion of Dr. Broska, found that Benitez's mental impairments were "non-severe" and denied her applications for benefits.  (R. 55-61 (SSI), 62-68 (DIB).)  Benitez requested a hearing before an ALJ.  (R. 99-100.)

**E.    Hearing**

ALJ Marguerite Toland held a hearing on October 4, 2018.  (R. 21.)  Two people testified: Benitez and Vocational Expert ("VE") Quintin Boston.  (R. 29, 49.)  Benitez testified that she did not take trains because she felt really uncomfortable when she was

around a lot of people.  (R. 30.)  With respect to caring for her son, Benitez said that she got up at 6:00 a.m. to wake him up, gave him cereal, made sure he went to school, then went back to bed and slept until 3:30 p.m. when he returned from school and she would fix him something to eat and make sure he went to bed.  (R. 38-39.)  She testified that her son had to repeat second grade because she was unable to get up in the morning to get him to school.  (R. 42.)  For food, Benitez mostly ordered groceries as going to the store was difficult for her because she forgot what she was there for most of the time.  (R. 39.)  Benitez testified that she kept the house clean, but it was hard for her, and that she did her laundry at a laundry mat, but with difficulty, often forgetting which washers she had put her clothes in and sometimes going months without doing laundry.  (R. 41-42, 44.)

Before starting medication, Benitez had worked as a dental scheduler but had anxiety, argued with patients a lot, and fought with her supervisor and coworkers (R. 31, 43); worked as a teaching assistant but was fired for missing too many days (R. 32); and worked at a janitorial supply store but was fired for not being able to follow instructions or learn new things (R 34-35).  The ALJ asked Benitez if she felt that she would still have those problems while on medication, to which Benitez answered yes.  (R. 44.)  More recently, even while on medication, Benitez lost part-time employment for missing days due to panic attacks.  (R. 34 (discussing part-time employment with Urban Health in 2015), 536-38 (August 2015 medical record discussing starting new job while on medication), 241 (earnings summary generated in 2018 documenting that only 2015 employment was with Urban Health).)

The ALJ asked the VE if a hypothetical individual – limited to low-stress work with only occasional face-to-face interaction with the public – could do Benitez's past work. (R. 49-50.)  The VE said no.  (R. 50.)  The ALJ then asked if the hypothetical individual could do any other work, and the VE said yes; the hypothetical individual could be a Laundry Laborer, Evening Industrial Cleaner, or Packer.  (R. 50.)  The VE added that the hypothetical individual could continue to do both of those jobs with the added restrictions of having no more than occasional interaction with coworkers or supervisors and needing to be off-task 10% of the workday.  (R. 50-52.)  If, however, the person needed to be off task 15% of the workday, could not accept criticism from her supervisor, or missed more than three days of work per month, there would be no work for that person.  (R. 51-53.)

## F.    ALJ Decision

The ALJ issued her decision on November 29, 2018.  (R. 86.)  She found that Benitez had two "severe" impairments, major depression and anxiety, neither of which, alone or in combination, equaled one of the Listings.  (R. 77.)  In reaching that conclusion, the ALJ assessed listings 12.04 and 12.06, which relate to depression and anxiety.  (R. 77.)  In evaluating mental disorders, "paragraph B" of each listing requires that the claimant have an "extreme" limitation in one, or a "marked" limitation in two, of the following abilities: (1) to understand, remember, or apply information; (2) to interact with others; (3) to concentrate, persist, or maintain pace; or (4) to adapt or manage oneself. *Bonilla Mojica v. Berryhill*, 397 F. Supp.3d 513, 531 (S.D.N.Y. 2019).  A "marked" limitation is defined as a serious limitation on "the ability to function independently, appropriately, effectively, and on a sustained basis," and an "extreme" limitation is defined as a complete inability to so function.  (R. 77.)  The ALJ found that Benitez had only a "mild" limitation in categories (1) and (4) and a "moderate" limitation in categories (2) and

(3), citing for each Benitez's ability to perform daily tasks, such as taking care of her son, shopping in stores, and taking public transportation.  (R. 77-78.)

As an alternative to "paragraph B," a claimant may meet "paragraph C" of a mental health Listing.  20 C.F.R. Pt. 404, Subpart P, App. 1 § 12.00(G)(1).  "The 'paragraph C' criteria are used to evaluate mental disorders that are serious and persistent, recognizing that mental health interventions may control the more obvious symptoms and signs of a claimant's mental disorder."  *Bonilla Mojica*, 397 F. Supp.3d at 531 (internal quotation marks omitted).  To satisfy paragraph C, the claimant must have a two-year documented history of the disorder with evidence of both (1) medical treatment, mental health therapy, psychosocial support, or a highly structured setting that is ongoing and diminishes the symptoms or signs of the disorder; and (2) only marginal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's life. *Id.* at 531-32.  The ALJ summarily concluded that Benitez did not meet paragraph C without identifying which of the requisite elements Benitez did not satisfy.  (R. 78.)

The ALJ then determined Benitez's RFC, finding that she could work at all exertional levels, except that she could not work at heights or climb ropes, ladders, or scaffolds and would need to be limited to low-stress (defined as unskilled work involving simple, routine tasks and having no fast production rate pace or strict production quotas such as assembly line work), could have no more than occasional face-to-face interaction with the public or co-workers, and would need to be off task up to 10% of a normal workday.  (R. 78-79.)

In reaching her conclusion, the ALJ assigned the medical opinions the following weights.  She assigned the opinion of Dr. Broska – the SSA's consultative examining

physician who interviewed Benitez once and did not review her medical records – "some weight," because "[t]he balance of this opinion is supported by the evidence and adequately considers the claimant's subjective complaints and self-reported retained mental capacity" with respect to some aspects of her functioning but did not adequately consider Benitez's subjective complaints or the evidence as a whole with respect to some other aspects of her functioning.  (R. 82.)  The ALJ ascribed the opinion of Dr. Fassler, the agency's non-examining consultative physician who essentially just summarized the opinion of Dr. Broska, "little weight," finding that it was not supported by the evidence and did not adequately consider Benitez's subjective complaints or self-reported retained capacities.  (R. 84.)

The ALJ assigned the opinion of Dr. Bhatt, Benitez's first treating psychiatrist, "little weight," because it was:

> more restrictive than indicated by the objective and treating evidence, including from Dr. Bhatt, which demonstrates depressive and anxiety disorders with persistent, but improved, symptoms with the claimant's course of treatment. In addition, Dr. Bhatt noted that the claimant was only partially compliant with treatment, and her current depression and anxiety status was strongly affected by her current living situation, adding that, while she[6] had been treating the claimant for 3 years, her current assessment of the claimant's limitations were effective as of only 6 months earlier.

(R. 83.)

The ALJ also assigned the opinion of Dr. Nodarse,[7] Benitez's second treating psychiatrist, "little weight," finding that it was:

> not supported by the evidence as a whole, including BronxCare treating records, which demonstrates greatly

---

[6] The ALJ incorrectly used "she/her" pronouns for Dr. Bhatt throughout her opinion.

[7] The ALJ incorrectly referred to Dr. Nodarse as Dr. "Nodanse" throughout her opinion.

improved psychological symptoms with the claimant's course of treatment.  In addition, this opinion does not adequately consider the claimant's self-reported retained mental capacity to understand, remember, and apply information; interact with others; concentrate, persist, and maintain pace; and adapt and manage herself despite her severe psychiatric impairments.

(R. 84.)

Finally, the ALJ assigned the opinion of Dr. Garfinkle, the examining consultative opinion retained by Benitez, "great weight."  (R. 83.)  That, however, was modified by the Appeals Council, as discussed below.

The ALJ acknowledged that Benitez could no longer perform her past relevant work but concluded that she could perform the jobs of laundry laborer, evening cleaner, and packer and thus was not disabled.  (R. 84-86.)

## G.    Appeals Council Modification

Benitez asked the SSA Appeals Council to review the ALJ's decision.  (R. 213-15.) The Appeals Council granted her request and modified the ALJ's decision in one respect but still denied Benitez benefits.  (R. 1-10.)  The Appeals Council's found that the opinion of Dr. Garfinkle should be afford "very little weight" because it was not well supported and was inconsistent with the record.  (R. 5.)  The Appeals Councill noted that Dr. Garfinkle met Benitez only once, and his opinion was at odds with (1) treating notes indicating that Benitez frequently denied having depressive symptoms, including four days before the exam with Dr. Garfinkle; (2) Dr. Bhatt's notes indicating that Benitez's attention, concentration, memory, cognition, and intelligence were normal; and (3) Dr. Bhatt's notes repeatedly indicating that Benitez was "psychiatrically stable."  (R. 5.)

The Appeals Council also emphasized that some of Benitez's statements, such as those about her ability to care for her child and denial of symptoms in treatment notes,

supported the conclusion that Benitez was not disabled.  (R. 5.) The Appeals Council otherwise affirmed the ALJ's decision.  (R. 4-5.)  The ALJ's decision, with the Appeals Council's modification, thus became the final opinion of the Commissioner.

## H.    Present Litigation

On June 30, 2020, Benitez filed the operative complaint in this case, seeking district court review pursuant to 42 U.S.C. § 405(g).  (Dkt. 1.)  On August 24, 2020, the parties consented to this Court's jurisdiction for all purposes.  (Dkt. 15.)  The parties then briefed their cross-motions for judgment on the pleadings, which are now before this Court for resolution.  (*See* Dkts. 21-22, 24-26.)

## DISCUSSION

This case must be remanded because the ALJ violated the treating physician rule and inappropriately weighed the opinion evidence.  On remand, after properly evaluating the opinion evidence, the ALJ should reconsider whether Benitez's impairments meet or equal paragraph B or paragraph C of Listings 12.04 or 12.06 and whether Benitez actually has the RFC to maintain gainful employment.

## A.    The Treating Physician Rule

An ALJ must evaluate every medical opinion received.  *Rodriguez v. Colvin*, No. 12-CV-3931, 2014 WL 5038410, at *17 (S.D.N.Y. Sept. 29, 2014).  A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 416.927(c)(2); *see also Burgess*, 537 F.3d at 128.  Conversely, an ALJ is not required to assign a treating physician's opinion controlling weight when it is contradicted by substantial evidence in the record. *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (noting that a treating physician's

opinion is not controlling when contradicted "by other substantial evidence in the record").[8]

When an ALJ gives a treating physician's opinion less than controlling weight, the ALJ must give "good reasons" for doing so.  20 C.F.R. § 416.927(c)(2) (stating that the agency "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's medical opinion"); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *Schaal*, 134 F.3d at 505.  "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell*, 177 F.3d at 133; *see also Schaal*, 134 F.3d at 505 ("Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error").

If the ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ must determine how much weight, if any, to give that opinion.  *Estrella*, 925 F.3d at 95.  In doing so, the ALJ must "explicitly consider" the following, non-exclusive "*Burgess* factors*": "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist."  *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) (citing *Burgess*, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2))).

---

[8] The regulations for evaluating medical opinions were amended in 2017, but the changes are only applicable to claims filed on or after March 27, 2017.  *See* 20 C.F.R. §§ 404.1527, 404.1520c; *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5844, *5867-68 (Jan. 18, 2017).  Because Benitez's claim was filed before that date, the Court applies the earlier regulations.

While failure to explicitly apply the *Burgess* factors is a procedural error, a reviewing court will not reverse the Commissioner's decision when the Commissioner has given "good reasons" for its weight assignment.  *Estrella*, 925 F.3d at 96.  "Good reasons" are reasons that assure the reviewing court that "the substance of the treating physician rule was not traversed."  *Id.*

The treating physician rule is "all the more important in cases involving mental health," such as this one.  *Flynn v. Commissioner Of Social Security Administration*, 729 F. App'x 119, 122 (2d Cir. 2018).  That is because mental health impairments are "not susceptible" to certain diagnostic tools that can be used to determine physical impairments during an exam, *id.*, and "[a] mental health patient may have good days and bad days [and] may respond to different stressors that are not always active," *Bodden v. Colvin*, No. 14-CV-08731, 2015 WL 8757129, at *9 (S.D.N.Y. Dec. 14, 2015), but a person with cyclical mental health issues, who "'half the time … is well enough [to] work, and half the time … is not[,] … could not hold down a full-time job,'" *Estrella*, 925 F.3d at 97 (quoting *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008)).  Accordingly, the longitudinal understanding of a claimant's impairment is particularly important with respect to mental health conditions and "cannot be readily achieved by a single consultative examination." *Bodden*, 2015 WL 8757129 at *9 (collecting cases); *Estrella*, 925 F.3d at 98 ("A one-time snapshot of a claimant's status may not be indicative of her longitudinal mental health").

"The same factors also must be considered with respect to what weight to give non-treating doctors, 'with the consideration of whether the source examined the claimant or not replacing the consideration of the treatment relationship between the source and the claimant.'"  *McGinley v. Berryhill*, No. 17-CV-2182, 2018 WL 4212037, at *12

(S.D.N.Y. July 30, 2018) (quoting *Butts v. Commissioner Of Social Security*, No. 16-CV-874, 2018 WL 387893, at *6 (N.D.N.Y. Jan. 11, 2018)), *R. & R. adopted*, 2018 WL 4211307 (S.D.N.Y. Sept. 4, 2018).  Although the Second Circuit has cautioned that ALJs should not rely heavily on the findings of consultative physicians that arose from a single examination, *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990), a consultative physician's opinion may nonetheless constitute substantial evidence, *see Petrie v. Astrue*, 412 F. App'x 401, 406 (2d Cir. 2011) (affirming ALJ reliance on findings of two consultative examiners in declining to afford treating physicians controlling weight).

**B.    Application**

In ascribing "little weight" to the opinions of Benitez's treating psychiatrists (Drs. Bhatt and Nodarse), the ALJ did not provide "good reasons" that assure the Court that "the substance of the treating physician rule was not traversed."  *Estrella*, 925 F.3d at 95. The opinions of both of Benitez's treating physicians contradict the ALJ's conclusion that Benitez had the RFC to work as laundry laborer, evening industrial cleaner, or packer in at least three ways.  The VE testified that a person could not hold those jobs – or any other job – if she (1) would miss work more than three times per month; (2) could not accept criticism from her supervisor; or (3) needed to be off task 15% of the workday.  (R. 51-53.)  The opinions of both of Benitez's treating physicians indicated that all three of those things were true about Benitez.  (R. 328-29 (Dr. Bhatt's opinion finding that Benitez's symptoms would cause her to miss work more than three times per month; prevent her from accepting or responding appropriately to criticism from supervisors; and interfere with her ability to work in numerous respects for more than 30%, and even 60%, of an eight-hour workday) 868-69 (Dr. Nodarse opinion finding same).)

In determining Benitez's RFC, the ALJ ascribed "little weight" to both of those

opinions based, in large part, on the fact that they allegedly conflicted with Benitez's treatment records.  (R. 83-84.)  The ALJ based that conclusion, however, on the ALJ's own review of the medical record, without an opinion from a doctor who had also reviewed the records and reached a similar conclusion.  In the context of this case, that was error. Neither the ALJ's own assessment of the treating doctors' medical records, the opinion of consulting examiner Dr. Broska, nor any of the other reasons cited by the ALJ, provided "good reasons" for ascribing "little weight" to the opinions of Benitez's treating physicians, as discussed below.

### 1.    Treating Physician Dr. Bhatt

The ALJ stated that Dr. Bhatt's opinion was inconsistent with his own treatment notes, which the ALJ characterized as showing improved symptoms with the claimant's course of treatment and deterioration tied to her non-compliance with her medication and stressful living situations.  (R. 83.)  An ALJ may not, however, reject a treating physician's opinion "solely on the basis that the opinions allegedly conflicted with the [physician's] own clinical findings."  *Balsamo*, 142 F.3d at 80; *see also Griffel v. Berryhill*, No. 16-CV-1772, 2017 WL 4286254, at *9 n.10 (E.D.N.Y. Sept. 26, 2017) ("To the extent the ALJ rejected [the treating source]'s opinions on the basis that [the treating source]'s [m]ental status examinations consistently demonstrate[d] normal to mild cognitive symptoms, such rejection was erroneous because the ALJ may only reject [the treating source]'s opinions based on contradictory medical opinions, not based on the ALJ's interpretation of [the claimant]'s medical records" (internal quotation marks omitted)); *Raja v. Astrue*, No. 11-CV-3490, 2012 WL 1887131, at *9 (S.D.N.Y. May 23, 2012) (ALJ improperly discounted treating physicians' opinions on the basis of conflicting medical records, rather than

conflicting medical opinions).

To discount the conclusion of a treating physician, the ALJ must rely on a contrary medical opinion, not the ALJ's own interpretation of the treating physician's medical records. *Balsamo*, 142 F.3d at 81; Griffel, 2017 WL 4286254 at *9 n.10; *Raja*, 2012 WL 1887131 at *9. Here, the only medical opinion to which the ALJ gave greater weight than the opinions of Benitez's treating physicians, and that supports the ALJ's RFC, is the opinion of Dr. Broska. The ALJ did not cite Dr. Broska's opinion as a reason for ascribing "little weight" to the opinions of Benitez's treating physicians. (R. 83-84.) Even if she had, however, the opinion of Dr. Broska would not have provided "good reasons" for so heavily discounting the opinions of Drs. Bhatt and Nodarse, because Dr. Broska did not review Benitez's medical records and did not have the longitudinal picture of Benitez's depression and anxiety, which is particularly important in cases involving mental health impairments. *Estrella*, 925 F.3d at 98; *Flynn*, 729 F. App'x at 122; *Bodden*, 2015 WL 8757129 at *9.

The Commissioner is not required, in every case, to provide a consultative examiner with a claimant's medical records. 20 C.F.R. § 404.1519n(c)(1)-(7) (listing the elements of a complete consultative examination, none of which require that the consultative examiner review the entire record); *Morgan v. Commissioner Of Social Security*, No. 20-CV-04554, 2021 WL 2940842, at *9 (E.D.N.Y. July 13, 2021). And, in some cases, the opinion of a consultative examiner who did not review the claimant's medical records may provide "good reasons" for an ALJ to discount the opinion of a treating physician. *Miltenberg v. Saul*, No. 17-CV-7199, 2020 WL 7042667, at *10 (E.D.N.Y. Nov. 30, 2020); *see also Genito v. Commissioner Of Social Security*, No. 16-

CV-0143, 2017 WL 1318002, at *9 (N.D.N.Y. Apr. 7, 2017) ("there is no legal requirement that opinion sources must have access to a full and complete record in order for their opinions to be sufficient to constitute substantial evidence"); *but see Mauro King v. Berryhill*, 251 F. Supp.3d 438, 444 (N.D.N.Y. 2017) ("A consultative examiner's opinion may not constitute substantial evidence where the consultative examiner is not provided the plaintiff's treatment record or diagnostic studies, i.e., the necessary background information" (collecting cases)).

The Commissioner must, however, "give the examiner any necessary background information about [claimant's] condition."   20 C.F.R. § 404.1517.   And, where a consultative examiner did not review important medical records, the consultative examiner's opinion cannot constitute "good reasons" for overriding a treating physician's opinion or substantial evidence to support an RFC.   *Burgess*, 537 F.3d at 132 (opinion of consultative examiner who did not review important medical record could not constitute substantial evidence contradicting opinion of treating physician); *Murphy v. Saul*, No. 17-CV-1757, 2019 WL 4752343, at *6 (E.D.N.Y. Sept. 30, 2019) (relying on opinion of consultative examiner who had not reviewed all relevant medical evidence, over opinion of treating physician, violated the treating physician rule and was error); *Figueroa v. Saul*, No. 18-CV-4534, 2019 WL 4740619, at *26 (S.D.N.Y. Sept. 27, 2019) (opinion of consultative examiner who did not review all relevant medical information was not substantial evidence in support of ALJ's RFC determination); *Citro v. Colvin*, No. 16-CV-6564, 2018 WL 1582443, at *14 (S.D.N.Y. Mar. 28, 2018) (opinion of consultative examiner who did not review relevant records could not be viewed as "substantial evidence" to undermine treating physician's opinion or independently support the ALJ's

RFC determination).

In this case, Benitez's treatment notes were important medical records that the consultative examiner should have reviewed in order to have a longitudinal picture of Benitez's mental health impairments. Having examined Benitez on merely one day, when her mental health conditions were cyclical and could vary widely day-by-day and based on stressors, was insufficient. *Estrella*, 925 F.3d at 97 ("'Cycles of improvement and debilitating symptoms of mental illness are a common occurrence,'" and a person who is well enough to work half of the time but not well enough to work the other half of the time, cannot hold down a full-time job (quoting *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014)); *id.* at 98 (the Second Circuit's frequent warning that "ALJs should not rely heavily on the findings of consultative physicians after a single examination … is even more pronounced in the context of mental illness where, as discussed above, a one-time snapshot of a claimant's status may not be indicative of her longitudinal mental health" (internal quotation marks and citation omitted)); *Bodden*, 2015 WL 8757129 at *9 (due to cyclical nature of mental health impairments, exacerbated by stressors, a longitudinal picture "cannot be readily achieved by a single consultative examination").

Without a contrary medical opinion on how Dr. Bhatt's treatment notes reflected on Benitez's longitudinal mental health, the ALJ's conclusion that Dr. Bhatt's opinion was contradicted by the doctor's own treatment notes was simply the ALJ impermissibly substituting her own judgment for that of a competent medical opinion. *See Riccobono v. Saul*, 796 F. App'x 49, 50 (2d Cir. 2020) ("ALJ cannot arbitrarily substitute her own judgment for competent medical opinion") (brackets omitted); *Balsamo*, 142 F.3d at 81 (same). Furthermore, while the medical record reflects periodic instances of self-reported

improvement along with difficulties at times of stress and non-compliance, the longitudinal record belies the conclusion that Benitez's condition consistently improved when her medication, compliance, and living situation remained stable.  To the contrary, the record is replete with episodes of decompensation even where all of those variables remained constant.

For example, from May to August 2017, Benitez's living situation, medication, and compliance (partial) remained the same, but she went from feeling okay to anxious to isolating in her house and ignoring outside influences.  (R. 885-94.)  In October 2017, her living situation and medication remained the same – and she went from partial to full compliance with her medication – but she reported having a panic attack in the subway for the first time.  (R. 901.)  From October 2017 to April 2018, Benitez remained fully compliant with a consistent medication regimen, and her living situation remained the same, but in April 2018, three treatment notes indicated worsening symptoms, which culminated with her feeling "very anxious," so much so that she could not wait in the waiting room long enough to receive her medication.  (R. 901 (October 2017), 905-12 (February-March 2018), 586-91 (April 2018).)  Likewise, from May to June 2018, her medication, compliance (full), and living situation (stable), remained the same, but she noted that it was becoming more difficult for her to leave the house every day.  (R. 912-17.)  All of those examples are consistent with periods of decompensation and the cyclical nature of depression and anxiety that make the opinions of treating psychiatrists so critical to determining the functional limitations caused by mental health impairments.  *See*

*Estrella*, 925 F.3d at 97.

In short, the reasons given by the ALJ for ascribing "little weight" to Dr. Bhatt's opinion thus do not assure the Court that the treating physician rule was not traversed.[9]

### 2.    Treating Physician Dr. Nodarse

The ALJ ascribed Dr. Nodarse's opinion "little weight" because she felt that it was "not supported by the evidence as a whole, including the BronxCare treating records, which demonstrates greatly improved psychological symptoms with the claimant's course of treatment," and because the opinion did not "adequately consider the claimant's self-reported retained mental capacity" as reflected in Benitez's treatment notes. (R. 84.) As discussed above, the ALJ was in no position to substitute her opinion of the medical implications of Benitez's treatment notes for those of a competent medical opinion. *See Balsamo*, 142 F.3d at 81.

In addition, there is simply nothing in the record stating that Benitez's psychological symptoms "greatly improved" with her course of treatment.  There is a single note indicating "significant improvement" at one point in time.  (R. 558.)  Aside from that, Benitez's improvement was generally characterized as "minimal" or non-existent (*see, e.g.*, 818-23, 894, 916-17) and, as noted, she suffered periods of decompensation (R.

---

[9] The ALJ appears to have discounted Dr. Bhatt's opinion in part because the opinion indicated that the extent of the impairments observed on the day the opinion was written "w[as] effective as of only 6 months earlier."  (R. 83 (ALJ decision), 329 (Dr. Bhatt opinion).)  That, however, is not evidence that Benitez could work a full-time job at the time the opinion was rendered, or even six months earlier.  Rather, it is more evidence of the cyclical nature of her mental health impairments.  Even if that cyclical nature allowed Benitez to work half the time, but not the other half of the time, it would prevent her from keeping a full-time job. *Estrella*, 925 F.3d at 97.  Moreover, Dr. Bhatt's opinion also stated that the limitations caused by Benitez's depression and anxiety were expected to last "at least 12 months" (R 325), thus satisfying the requirement that Benitez's disability "has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

327 (Dr. Bhatt noting episodes of decompensation), 519 (Dr. Garfinkle noting same), R. 885-894 (May-August 2017 decompensation), 901 (October 2017 decompensation), 905-12 (February-March 2018 decompensation), 586-91 (April 2018 decompensation), R. 912-17 (May-June 2018 decompensation).)

While Benitez may have self-reported that she was not feeling depressed or anxious at specific points in time, she self-reported anxiety, depression, and other mental health concerns at other points in time, and her treating physicians consistently believed that she needed continued treatment for her depression and anxiety.  (R. 533-35 (July 2015, reported anxiety), 540 (October 2015, reported on-and-off anxiety and depression), 543 (January 2016, reported anxiety), 545-46 (February 2016, reported being overwhelmed), 894 (August 2017, reported isolating), 901 (October 2017, reported anxiety attack in subway), 586-91 (April 2018, reported being overwhelmed and very anxious, including too anxious to wait in waiting room), 916-17 (June 2018, reported that it was becoming harder to leave the house every day); R. 542, 544, 549, 555, 558, 565, 568, 573, 585, 871, 875, 877, 881, 884, 887, 892, 898, 900, 903, 909, 912, 920 (doctors noting at every treatment that impairments persisted and further treatment was needed).)

Characterizing Benitez's medical records as demonstrating consistent, great improvement while on her course of treatment ignores the longitudinal picture of her mental health conditions, which was decidedly cyclical, and exemplifies the importance of a treating physician's opinion on how a patient's mental health conditions will affect her functional capacity.  *Estrella*, 925 F.3d at 95.

Although Dr. Nodarse had only treated Benitez three times when he rendered his opinion (a point the ALJ did not mention) (R. 865), Dr. Nodarse had a unique view on

Benitez's longitudinal medical history for several reasons.  Dr. Nodarse replaced Dr. Bhatt as part of Benitez's treatment team at BronxCare, which had been treating Benitez several times per month for years, and Dr. Nodarse specifically noted that he reviewed Benitez's medical file and consulted with her psychotherapist, with whom Benitez treated twice per month.  (R. 867.)  Treatment notes also indicate that Dr. Nodarse had direct conversations with Benitez's psychotherapist about her conditions.  (R. 819-20 (Dr. Nodarse brought psychotherapist into exam to discuss treatment).)  Dr. Nodarse's opinion is also the only one in the record to account for the final year of Benitez's treatment notes, which include an episode of extreme decompensation (April 2018).  (*See* R. 869 (Dr. Nodarse opinion, rendered September 2018), 521 (Dr. Garfinkle opinion, September 2017), 325 (Dr. Bhatt opinion, February 2017), 320 (Broska opinion, January 2017).)

As with Dr. Bhatt's opinion, the reasons given by the ALJ for discounting Dr. Nodarse's opinion do not assure the Court that the treating physician rule was not traversed.

### 3.    Other Opinions, Listings, And Available Jobs

The Commissioner ascribed "very little weight" to the opinion of Dr. Garfinkle – the consultative examining physician retained by Benitez – because it was allegedly not supported by and inconsistent with parts of Benitez's treatment notes in which she denied impairments and was found to be psychiatrically stable.  (R. 5.)  As discussed above, that conclusion ignores the longitudinal view of Benitez's records, which demonstrates cyclical impairments and periods of decompensation that would affect her ability to work.  *See Estrella*, 925 F.3d at 95.

Although Dr. Garfinkle was not one of Benitez's treating physicians, he did review her records and could thus take into account a longitudinal view of Benitez's condition.  It

was therefore improper for the Administration to substitute its own view of those records for Dr. Garfinkle's opinion, especially without a contrary opinion in the record based on a longitudinal view of Benitez's conditions.  *Balsamo*, 142 F.3d at 81.

On that note, the Administration correctly pointed out that Dr. Garfinkle only examined Benitez once.  (R. 5.)  However, Dr. Broska also only examined Benitez once, and her opinion was afforded "some weight," despite the facts that (1) Dr. Garfinkle reviewed Benitez medical records and Dr. Broska did not; and (2) Dr. Garfinkle's opinion was much more in line with the opinions of Benitez's treating physicians than Dr. Broska's. (*See* R. 320 (Dr. Broska opinion based on one exam), 26 (Dr. Broska did not review Benitez's medical records), 82 (Dr. Broska opinion given "some weight"), 514 (Garfinkle reviewed medical record), 5 (Garfinkle opinion given "very little weight").)  Ascribing the most weight to the only examining doctor who did not review Benitez's medical records is quite problematic, especially given the heightened importance of having a longitudinal picture of mental health conditions.  *Estrella*, 925 F.3d at 97; *Flynn*, 729 F. App'x at 122; *Bodden*, 2015 WL 8757129 at *9; *see also Dais v. Saul*, No. 18-CV-7309, 2020 WL 1550556, at *6 (E.D.N.Y. Mar. 31, 2020) (significant reliance on opinion of one-time examination without review of medical history was legal error requiring remand).

Furthermore, ascribing more weight to the opinion of Dr. Broska (which supported the Administration's disability determination) than the opinions of Drs. Bhatt, Nodarse, and Garfinkle (which contradicted the Administration's disability determination), was also impermissible cherry-picking.  *Salisbury v. Saul*, No. 19-CV-706, 2020 WL 913420, at *34 (S.D.N.Y. Feb. 26, 2020) (an ALJ may not "'cherry-pick' medical opinions that support his or her opinion while ignoring opinions that do not"); *Jones v. Saul*, No. 19-CV-5542, 2020

WL 5775525, at *12 (S.D.N.Y. Sept. 11, 2020) (same), *R. & R. adopted,* 2020 WL 5775195 (Sept. 28, 2020).[10]

In evaluating the medical opinions of record, the ALJ (and Appeals Council) thus committed multiple errors by transgressing the treating physician rule, cherry-picking, failing to provide Dr. Broska with necessary information, and substituting their opinions for those of medical professionals.   These errors were hardly inconsequential.   For instance, each of the doctors who reviewed Benitez's medical records – Drs. Bhatt, Nodarse, and Garfinkle – concluded that Benitez had "marked" or "moderate-to-marked" limitations in numerous functional capacities.   (R. 328 (Bhatt), 520 (Garfinkle), 868 (Nodarse).)   While the definitions and structure of the forms on which those doctors rendered their opinions do not directly parallel the relevant SSA regulations, it would appear that the only way to find – as the ALJ did – that Benitez's impairments did not meet or medically equal paragraph B (which requires at least two marked or one extreme limitation) or paragraph C (which requires persistent limitations despite treatment) of Listings 12.04 or 12.06, was to eschew those opinions.   When properly assessing the medical opinions on remand, the ALJ should reconsider whether Benitez's conditions met

---

[10] In addition, the ALJ gave no explanation for why she ascribed "some weight" to the opinion of Dr. Broska while ascribing "very little weight" to the opinion of Dr. Fassler (the SSA's non-examining consultative opinion) when Dr. Fassler effectively just summarized the opinion of Dr. Broska.   (*See* R. 58-59 (Dr. Fassler opinion), 320-22 (Dr. Broska opinion), 84 (ALJ on Dr. Fassler).)   That contradiction is especially troubling given that the ALJ found that Dr. Fassler's opinion was not supported by the evidence and did not adequately consider Benitez's subjective complaints or self-reported retained capacities. (R. 84.)

or medically equaled Listing 12.04 or 12.06.

Additionally, as noted above, the opinions of Benitez's treating physicians indicate that Benitez could not hold any job, including those the ALJ concluded that she could, because she (1) would miss work more than three times per month; (2) could not accept criticism from her supervisor; and (3) her symptoms would interfere with her ability to work more than 15% of the workday. (R. 51-53 (VE testimony); R. 328-29 (Dr. Bhatt's opinion); 868-69 (Dr. Nodarse opinion).) The opinion of Dr. Garfinkle also included those findings. (R. 8.) Thus, the opinions of all three of the doctors who reviewed Benitez's medical records indicate that she did not have the RFC to perform the jobs that the ALJ concluded she could. Again, the only way for the Commissioner to conclude that Benitez was not disabled was to substantially discount the opinions of all three of the doctors who reviewed her medical records while elevating the opinion of the one consultative examining doctor who did not. Accordingly, when the ALJ reevaluates the medical opinions on remand, she should reassess her RFC determination and reevaluate whether Benitez can actually hold the jobs that the ALJ concluded she could.[11]

## CONCLUSION

For the reasons explained above, Benitez's motion is GRANTED, the Commissioner's motion is DENIED, and the case is remanded for further proceedings consistent with this decision.

---

[11] Given the Court's conclusion that this case must be remanded for the ALJ to reevaluate the weights given to the opinion evidence, the Court need not reach Plaintiff's other arguments.

SO ORDERED.

ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:        September 17, 2021
              New York, New York

Copies transmitted to all counsel of record.